## Case No. 11,523.

### In re RADWAY.

[3 Hughes, 609.] [1]

District Court, E. D. Virginia. Oct., 1877.

HOMESTEAD—EXEMPTION—JUDGMENT FOUNDED IN TORT—BANKRUPTCY—REMOVAL.

1. Where the state law allows the homestead exemption (with certain exceptions) against any levy by execution founded upon "any demand for any debt contracted" by the head of a family, *held*, that the exemption is good against judgments founded upon tort, both principal and costs.

2. *Held*, also, that the removal of a bankrupt out of the state after his adjudication in bankruptcy does not defeat his right to the homestead.

In bankruptcy. On the 16th day of May, 1877, C. L. Radway, being a resident of Richmond, engaged in business, a householder, and the head of a family, was sued by one James Mitchell for the seduction of his daughter Laura, and on May 18th he was sued by said Mitchell for an insult to his daughter Lucy. Radway being then temporarily absent from the state, attachments were forthwith issued against him as an absconding debtor, and executed on the above dates in respective suits, upon, among others, one George A. Ainslie, who had in his possession two certain notes, executed by one J. N. Wilkinson, in part payment of the purchase-money of a house bought by said Wilkinson from said Radway, each dated February 5th, 1877: one payable sixteen months after date for $1,698.42, and the other twenty-eight months after date for $1,847.18, and held by Ainslie as collateral security to indemnify him from loss as his bail in a criminal proceeding growing out of these charges. Pending these suits and before judgments were rendered, Radway, in conformity with the 4th section of chapter 183 of the Code of Virginia of 1873, claimed the benefit of the homestead exemption in the notes referred to, in the hands of Ainslie, by filing of record a homestead deed dated on the 12th day of June, 1877. In the meantime Ainslie, holder, and Wilkinson, maker, appeared before the court, and admitted their liability, and on the 19th day of June, 1877, judgment was rendered in the first of the suits in favor of the plaintiff against Radway for $2,500, with interest from date, and $31.64 costs; and on the following day Radway confessed judgment in favor of the plaintiff in the other suits for $500, with interest from date, and $19.08 costs; and, in consideration of the acceptance thereof by the plaintiff, he released all errors of record in the other suit. Upon these judgments executions were issued June 23d, 1877, and were received by the sheriff on the 25th of the same month, returnable first Monday in August, 1877. On the 30th day of June, 1877, Radway filed his petition in bankruptcy

1 [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

and was duly adjudicated a bankrupt, and upon the foregoing state of facts applied by petition for a homestead exemption in the notes referred to. The subject was referred to the register, who reported in favor of the validity of the homestead exemption against the judgment, not only as to the principal of the judgments, but also the costs, and in favor of the allowance of the exemption to the bankrupt, notwithstanding the objection that he had ceased to be a resident of the state. This report was excepted to as contrary to the law and the facts by the plaintiffs in the two judgments rendered.

James Caskie and W. W. Henry, for bankrupt.

The first question to be considered in this case is the one raised by the Mitchells in their answer, that "the claims which they assert against said Radway are of such a nature that said Radway cannot claim a homestead as against them. The execution under which respondents claim is not issued on any demand for any debt contracted by said Radway. It is only as to such demands that the homestead law applies. The essence of this suit is that it is for a tort, and it is in no sense a demand for a debt contracted." We will first direct our attention to the above construction placed upon the homestead law of this state, for the reason that if the foregoing views are sustained, it will be unnecessary to consider the other question presented in said answer. The language of our statute is that "every householder or head of a family shall be entitled . . . to hold exempt from levy, seizure, garnisheeing, etc., issued on any demand for any debt heretofore or hereafter contracted, his real and personal property," etc. Code Va. p. 1168, § 1. What is the meaning of the word "debt" in this section? The general and usual signification of the word is an obligation to pay money, no matter how that obligation arose. The object and aim of all homestead laws are to afford protection to the debtor and family from the demands of creditors, and therefore we are compelled to think that the word "debt" as above used must be used in its broadest and most comprehensive sense, and not in the narrow sense which the respondents in this case apply it. We are sustained in maintaining the position that we have taken, that the word "debt" as used in section 1, c. 183, Code Va., is to be taken in its broadest sense by the language of section 7, art. 11, p. 99, of the constitution of this state, this being the article of the constitution by virtue of which the legislature enacted the homestead law. The language of that section is as follows: "The provisions of this article shall be construed liberally, to the end that all the intents thereof may be fully and perfectly carried out." Code Va. p. 99. Again, in looking over the exceptions enumerated in our statute, as against which the homestead exemption does not operate, we-

fail to find that the judgments of the respondents in this case are embraced in any of said exceptions. Another strong ground for our construction of the word "debt," and which is particularly applicable to the case at bar, is to be found in a late decision of our court of appeals. The learned judge who delivered the opinion, in speaking of the policy which has dictated homestead exemptions, said it was "a policy suggested by considerations both of a political and a benevolent character. . . . Benevolent, because the possession of the homestead is the security of the family against the improvidence, the follies, and the imprudences of the father or husband." Hatorff v. Wellford, 27 Grat. 361, 362. We have found a case reported from Wisconsin in which the question was whether the homestead of a judgment debtor is liable to sale, where the judgment was rendered in an action of tort; in this case it was decided that the homestead of the debtor was not liable to the satisfaction of such judgment, though the statute of the state used the words "debt" and "contracted." The opinion of the court was that "although there may be a technical distinction between 'debt' and 'damages,' still the word 'debt' itself is commonly and generally used to describe all obligations to pay money, whether arising from contract or imposed by law as a compensation for injuries." And in this general sense the word was evidently used in this (Wisconsin) statute, and the word "contracted" does not mean founded upon a contract, but it was used in its more general sense as equivalent to "incurred." Smith v. Omans, 17 Wis. 406; 44 Ill. 451; 66 N. C. 206. We also insist that the judgments of the respondents are debts founded upon contracts, as used in our homestead statute, because a judgment is an express contract of record. Blackstone says they are contracts of the highest nature. 2 Bl. Comm. 465; 1 Story, Cont. § 2. This rests on the principle that the law implies a promise by every one to ratify whatever the law of the land orders or directs him to pay. "A great many of human transactions depend upon implied contracts which are not written, but grow out of the acts of the parties." Ogden v. Saunders, 12 Wheat. [25 U. S.] 341. The bankrupt having committed a tort upon the persons of the Mitchells, respondents, the law implies a contract on the part of the bankrupt to pay the damages resulting from the committal of the tort. As soon, therefore, as that damage is ascertained it becomes a debt founded upon a contract.

Hoping that we have sustained our position that a judgment founded upon a tort does not operate so as to deprive the householder or head of a family of his homestead exemption, we will now consider another question raised in respondents' answer, that the bankrupt was not, on the 16th day of May, 1877, the date of the attachments issued against his property upon the institution of suits

against him by the Mitchells, respondents, and is not now, a resident of this state, but was, and is, in fact, a resident of Texas. Upon these questions, Register T. S. Atkins, by direction of the court, has taken evidence, the only witnesses being those summoned by the Mitchells, respondents. These depositions conclusively show that the bankrupt was not at the time of the issuing of said attachments nor is he now a resident of Texas. The bankrupt states in his testimony that in February, 1877, he went to Texas for the purpose of seeing the country, but that he had never decided to leave this state and settle there. It must be borne in mind that this visit of the bankrupt was nearly three months before he was arrested on the criminal charge of seduction, and more than three months before the attachments were issued against his estate at the instance of the Mitchells. He was, at that time, the agent in this state for the Wheeler & Wilson Manufacturing Company, which agency he did not resign until his arrest on charge of seduction, and only then because he thought the charges against him were of such a nature as to make it desirable that he should resign. In answer to a question from his own counsel he stated that he had never positively decided to leave this state. In response to a question as to his future intention, he said that if he got his exemptions he thought he would go into business here, but if he did not get them he did not know what he would do. Mr. G. A. Ainslie, a witness summoned by the respondents, stated that he had had frequent business relations with the bankrupt, and that, so far as he knows, the bankrupt had never left or intended to leave the state. Mr. Robert Alvis, the other witness examined upon this subject, testified to the same effect. There has not been a particle of evidence adduced to show that the bankrupt purchased or proposed to purchase any property in the state of Texas. The testimony shows that his family were here during his visit to Texas, and are at the present time in this city. The bankrupt also testifies that about two years ago he went to California to see if he liked the country, and whether he could better his condition by settling there, but that he decided to remain in Virginia. We call attention to the fact that the copies of attachment issued against the estate of the bankrupt in the Mitchell suits, and which are filed in the respondents' answer as exhibits "A" and "B," are attachments issued against the bankrupt, not as a non-resident, but as a resident about to leave the state. Our law provides for the issuing of attachments against the estate of non-residents, and also against the estate of residents about to leave the state. The respondents chose to issue their attachments against the estate of the bankrupt as a resident about to leave the state, showing conclusively that at that time they believed him to be a resident of the state. The charge which they make in their

answer that he was and is a non-resident was an afterthought, to the substantiation of which there is no evidence. To constitute a person a non-resident he must have left the state sine animo revertendi. 37 Ill. 73; 25 Ill. 221; 39 Ill. 590; 6 Allen, 510; 8 Allen, 576; 14 Allen, 1; 47 N. H. 46; 12 Ohio St. 431. As to what may be the intention of the bankrupt for the future, though he has signified his intention of remaining here, we insist it is not in the province of the court to inquire. In deciding whether the bankrupt is entitled to the homestead exemption the court has only to determine whether or not he was, at the time of the filing of his petition praying to be adjudicated a bankrupt, and is now, a resident. The evidence conclusively sustains the affirmative of this proposition. Certainly a trip to Texas five months before bankruptcy, made for the purpose of seeing the country, the family of the bankrupt being all the time in this state, the bankrupt holding at the time the office of agent of the Wheeler & Wilson Manufacturing Company, and his bankruptcy never dreamt of during the visit, cannot be considered to be a change of residence. "If the debtor has a family, his residence is where they reside, although he may make temporary sojourn in another state." Stiles v. Lay, 9 Ala. 795.

Now, as to the right of the bankrupt to claim his homestead exemption as against the Mitchell attachments and judgments. By the act of March 3d, 1873 [17 Stat. 577], amendatory of the bankrupt act, it is provided that "there shall be exempted to the bankrupt such property as is exempted from levy and sale upon execution or other process, or order of any court by the laws of the state in which the bankrupt has his domicile at the time of the commencement of the proceedings in bankruptcy, to an amount allowed by the constitution and laws of each state as existing in the year 1871, and such exemption shall be valid against debts contracted before the adoption and passage of such state constitution and laws (this part of the act has been declared unconstitutional), as well as those contracted after the same, and against liens by judgment or decree of any state court, any decision of any such court rendered since the adoption and passage of such constitution and laws to the contrary notwithstanding." By virtue of this law, then, all bankrupts who have been adjudicated such since the passage of the act of the legislature of Virginia, passed June 27th, 1870, commonly known as the "Homestead Act" [Laws Va. 1869–70, p. 198], are to be allowed the exemption provided therein against all claims of creditors created subsequent to its passage. The notes which were attached in the hands of G. A. Ainslie as garnishee, and out of which the bankrupt claimed his homestead prior to the judgments rendered against him in the Mitchell suits, are made by the same chapter of the

Code under which the attachments were issued proper subjects for the operation of the homestead exemption, even though the said notes were in the possession of the garnishee. After the garnishee has appeared and acknowledged his indebtedness to the judgment debtor, the statute provides that "the court may order him to pay the amount so found due by him, etc., . . . provided that the judgment debtor may claim that the amount so found due from the garnishee shall be exempt from the payment of the debt to the judgment creditor; and if it shall appear that the said judgment debtor has not claimed and held as exempt the amount of his homestead in other property or thing, then the court shall not render a judgment for the amount so found due in favor of the judgment creditor, except it be for the excess of the same over and above the homestead exemption." Code Va. pp. 1013, 1014, c. 148, § 17.

The costs mentioned in respondents' answer are plaintiff's costs, and therefore do not affect the bankrupt's homestead exemption, as he was the defendant in the suits in which they were incurred. The Mitchell respondents have utterly failed to substantiate the charges made in their answer that "the bankrupt has made away with his estate with intent to hinder, delay, and defraud the respondents, that he refused to be assessed for taxes as a resident of Virginia, that he bought a farm in Texas, that the surety on his bail bond in the criminal prosecution demanded the notes as collateral, because he knew that the bankrupt had changed his residence, and he, the surety, was apprehensive that he would not return, or that the bankrupt ever represented himself as a resident of Texas. The evidence taken conclusively proves to the contrary.

The only remaining point asserted by the respondents' answer which now remains to be considered is, that if it should be decided that the bankrupt is entitled to a homestead exemption in the notes or any other property, even then he has but a usufruct therein, which when exhausted leaves the property subject to respondents' judgments, and that the bankrupt cannot be permitted in any event to touch or handle said property until he has given bond and security conditioned to pay over to respondents respectively their due proportion thereof when his homestead right therein is ended, and that if he is not able to give bond and security conditioned as above then that the homestead exemption be invested in an interest-bearing fund, and he be permitted to receive the interest so long as his homestead claim exists.

The counsel for respondents has informed us that in support of his usufruct proposition he refers to the decision of the chancery court of the city of Richmond in the case of Richardson v. Butler, reported in February number (1877) of Virginia Law Journal, which decision is based for the most part on the

case of Black v. Curran, 14 Wall. [81 U. S.] 469. This last-mentioned case is from the state of Illinois, the statutes of which, relating to homesteads, enact: Section 1: "There shall be exempt from levy and forced sale, under any process or order from any court in this state for debts contracted, the lot of ground and buildings thereon, occupied as a residence and owned by the debtor, being a householder, etc. Such exemption shall continue after the death of such householder for the benefit of the widow and family continuing to occupy such homestead until the youngest child," etc.

Under this law the supreme court of the United States decide that the homestead right cannot, in an absolute sense, be said to be an estate in the land. The statutes of this state in relation to homesteads so materially differ from those of Illinois that a decision under the laws of the latter state cannot be considered as authoritative upon the laws of this state. The 1st section of our homestead act reads as follows: "Every householder or head of a family shall, as provided for by the constitution, be entitled . . . to hold exempt from levy, seizure, etc., . . . his real and personal property or either, including money and debts due him . . . to the value of not exceeding $2000 to be selected by him." Section 1, c. 183, pp. 1168, 1169, Code Va.

It will be seen at once that occupation of the land and buildings thereon which is essential to the right of homestead in Illinois is not at all essential with us. Our law gives the householder a homestead to the amount of $2000 in any kind of property which he may have with no conditions of occupancy. Under the statutes of this state an estate of homestead is an estate of freehold. It is a species of estate not known to the common law, but it seems to have all the incidents of a freehold estate, and to come within the definition given by elementary writers. 1 Bl. Comm. bk. 2, p. 72, c. 7. It is an estate indeterminable in its duration. Even in Massachusetts, where occupancy is one of the essentials for the right of claiming a homestead, the homestead right is regarded as an estate, and the supreme court of that state have gone so far in treating the homestead right as an estate as to say that although a homestead cannot be acquired except by a householder having a family, yet when once acquired and still occupied by him it has been held not to be defeated or lost by the death or absence of his wife and children. Doyle v. Coburn, 6 Allen, 73; 12 Allen, 34. Chief Justice Waite. in speaking of the interest of the householder in his homestead exemption, says: "The object was to give the householder full power and control over his property; to permit him to use it in such manner as in his judgment would best promote the interest of himself and family, and, if he had not by some voluntary act of his own deprived himself of the right, to allow

him to select and hold a certain specified amount, not description of property, free from the process of law to enforce the payment of his debts." In re Solomon [Case No. 13,166]. This decision was made in this circuit, and therefore should have great weight in the consideration of this case. That the bankrupt is entitled to his $500 exemption we suppose will not be denied, and we, therefore, hope it will be given him out of such of his property out of which he has not claimed the homestead exemption.

John S. Wise, for creditors.

By the terms of our constitution and laws, from motives of public policy and humanity, exemptions are made. They are of two classes. One class of exemptions was made by law, without any constitutional requirement; the other is pursuant to constitutional requirement, "in addition to the articles now exempt," as the constitution expresses it. I propose to look at those two exemption laws, their language. their reason, their spirit, etc. In the year 1866 an act was passed by the Virginia legislature as follows: "In case of a husband, parent, or other person who is a housekeeper and head of a family, there shall be exempt from distress or levy the following articles," etc. Under this are included the family Bible, pictures, books, a pew in church, cemetery lot, wearing apparel, beds, stoves. a cow, horse. household articles. farming utensils, sewing machine, etc. Code 1873, p. 476. This law was merely a re-enactment of the laws which had existed from the beginning of our government. It was founded on the necessities of society—not only on Christian charity, which forbade any creature in the community from being stripped absolutely and left to starve, but from a public policy opposed to having paupers left as a charge upon the public; for every humane government ought to support its paupers. Our lawmakers knew this. They knew that a certain modicum of property was absolutely necessary to the meanest mortal in the community who was head of a family, and who owned it. Wherefore. recognizing this, they passed a law declaring, as above, that such should be "exempt from distress or levy." There could be no question as to the policy or language of this law. The policy was plain, the language plainer,—"exempt from distress or levy,"—the largest words of their kind, embracing every class of judicial seizure, unqualified by any conjunctive phrase. The unfortunate debtor, the derelict tenant, the seducer, the slanderer, the blackguard— none were too unfortunate, none too bad to be entitled to exemption from distress or levy to the above extent. The reasons for this exemption are too obvious for argument. That it is good as against any levy is too plain for argument. That the provision is just is equally apparent. When the framers of our constitution began their labors they had the above exemption law before them.

By reference to the Journal of Debates of that convention it will be seen that Charles H. Porter, a New Yorker, presented the draft of the proposed homestead. By reference to the acts of assembly of New York (Laws N. Y. 1850, p. 499, c. 260), it will be seen that the New York law reads: "In addition to the property now exempt by law from sale under execution, there shall be exempt by law from sale on execution for debts hereafter contracted," etc. By reference to the decisions of New York it will be seen that long before our convention acted the meaning of the above language had been construed by the courts of New York as follows: "The homestead exemption act does not contemplate the exemption of a homestead from sale on execution issued under judgment for cause of action sounding in tort." Lathrop v. Singer, 39 Barb. 396. So that when our convention passed its homestead provision it not only had before it an exemption law of its own which exempted certain articles from all levies; it not only had the New York statute, the language of which had been construed as exempting from debts contracted, not from debts in tort, but it had the statutes of other states before it which had been construed as giving a homestead good against torts. Thus, for example, the Wisconsin statute then in existence read (Rev. St. Wis. 1849, c. 102, § 51, etc.): "A homestead . . . shall not be subjected to forced sale on execution or any other final process from a court, for any debt or liability contracted," etc. And that statute, as well as the Illinois statute, had been followed by others, giving the wife such an interest in the homestead that she acquired a joint estate. The legislatures of those states had declared it to be the purpose of the statutes to prevent any alienation or charge of any kind upon the homestead save by the joint act of the husband and wife. As a consequence these statutes, so different in their language and in their frame from the New York statute, had been construed by the courts of Wisconsin and Illinois. The Wisconsin statute was held to give a homestead as against a tort on the ground that "the word 'liability,' used in conjunction with the word 'debt,' is broad enough to include all claims, whether founded on tort or contract," and on the further ground that the statute "intends to protect the family of the debtor as well as himself, and he is prohibited even from alienating without the wife's consent." Smith v. Omans, 17 Wis. 394. And in Illinois, construing the statute of that state, which reads: "From levy and forced sale, under any process or order . . . for debts contracted," etc., the claim being on a slander judgment, the court of appeals said point-blank that the case did not fall within the terms above quoted, but relied on a law of 1857, subsequently passed, the like of which is neither in New York nor Virginia, to justify their judgment. I refer to Conroy v. Sullivan, 44 Ill. 451, in which case it was said: "It is true this case does not fall within the actual terms of the homestead act of 1851 (quoting it as above). The judgment in this case was not strictly a 'debt contracted,' but the law of 1857 [page 119], declared it to be the object of the legislature to prevent the alienation of the homestead in any case, except by the consent of the wife." Loomis v. Gerson, 62 Ill. 11.

At the time of this constitutional exemption, the meaning of such words as were used had also been construed in Georgia. By a law of 1851 (Cobb's Dig. Laws Ga. 1851, p. 389), "every white citizen of this state, male or female, being the head of a family, shall be entitled to own, hold, and possess, free and exempt from levy and sale by virtue of any judgment, order, or decree of any court of law or equity in this state, founded on any contracts made after the 1st of May next, or any process emanating from the same," twenty acres of land, etc. In Davis v. Henson, 29 Ga. 345, the exemption was declared to apply only to judgments founded on contract, and not to those founded on torts.

Now, not only were these various decisions before our framers, but in Pennsylvania it had been decided (Kenyon v. Gould, 61 Pa. St. 292): "No exemption under an execution on judgment in action ex delicto is allowable to the defendant under Pennsylvania act of April 9th, 1849,"—an act using words identical with the New York act. See, also, Com. v. Dougherty, 8 Phila. 366. These were the lights before the framers of our constitution when they acted, for neither the law nor the decision in North Carolina were then in existence. With such laws and such decisions before them, they proceeded at the instance of a New Yorker to enact a law as follows: "Every householder or head of a family shall be entitled, in addition to the articles now exempt from levy or distress for rent, to hold exempt from levy, seizure, garnisheeing, or sale under any execution, order, or other process issued on any demand for any debt heretofore or hereafter contracted," etc. Const. Va. art. 11, § 1. Was that law framed on the Wisconsin, the Illinois, or the New York statute? Let us compare them.

Wisconsin: A homestead "shall not be subject to forced sale on execution or any other final process from a court for any debt or liability," etc.

Illinois: "From levy and forced sale under any process or order . . . . for debts contracted," etc. Speaking of slander, the court of appeals says: "It is true this case does not fall within the actual terms of the act of 44 Ill. 451, 62 Ill. 11, and invokes another statute to aid it,"—such as we have not.

New York: "In addition to the (property) now exempt (by law) from sale (under execution) (there shall be) exempt by law from

sale on execution for debts hereafter contracted," etc.

Virginia: " . . . . . In addition to the (articles) now exempt from (levy or distress for rent) (to hold) exempt from (levy, seizure, garnisheeing, or) sale, under any execution (order or other process issued on any demand) for (any) debt (heretofore or) hereafter contracted," etc.

Can there be any doubt that the New York statute was before the draftsman of that law? Can there be any doubt that our law uses the same guarded language as the New York statute? Can we presume that when as to the poor debtor's exemption our lawmakers gave an exemption against all levies, and used the restricted language above set out as to homestead claimants, they were ignorant of the restricted interpretations placed on the statute they were copying? I think not. The mind of any sensible man must have been drawn to the difference in language between the two enactments. In Schouton v. Kilmer, 8 How. Prac. 527, this very distinction had been pointed out. The learned judge there refers to the difference of the language used in the New York statute in exempting the few household articles from levy under any execution, and that of the homestead law restricting the exemption to executions for debts contracted. Lathrop v. Singer, 39 Barb. 399. "There is no language to be found in the act indicating an intention to exempt from sale any property on judgments except for debts contracted. If the intention had been to extend the exemption to sales under all judgments recovered, it would have been quite easy to have expressed it, and it is most likely if that had been the intention that it would have been so expressed in the act. The omission to do so, and the limitations in words to debts contracted, afford pregnant evidence that the legislature did not intend to extend its operation beyond the case expressed."

If this reasoning was good as to the New York legislation, it seems to me tenfold strong as to the Virginia legislation framed on this statute, and in the full glare of these interpretative decisions. That our statute is not framed on the Wisconsin statute is palpable from the omission of the word "liability." That it is not analogous either to the Wisconsin or Illinois statutes in the joint interest it creates in the wife, seems settled by the decision of the chief justice in the Solomon Case [Case No. 13,166]. For whereas in both those states it has been expressly pronounced that nothing but the joint act of husband and wife could affect the homestead, whether it be in tort or contract; whereas the homestead in those states has been adjudged thus: "He cannot deprive them of the right to it without the consent of the wife, either by his contracts or torts. In the light of both these laws (i. e., original homestead law and the act of 1857, declaring it to be the object of the legislature to prevent alienation of the homestead in any case, except by the consent of the wife), the supreme courts held it was the evident intent of the legislature to protect the homestead as a shelter for the wife and children, independently of any act of the husband." The learned chief justice, like the supreme courts of New York, Pennsylvania, and Georgia, has viewed our statute in quite a different light. In the Solomon Case, Chief Justice Waite construes our statute thus: "The constitution grants the exemption as a privilege to the householder." "It declares that he shall be entitled to hold property to be selected by him." "The privilege, so far as it is given by the constitution, is personal to the householder. The language is 'to be selected by him.' . . . If he can waive at all, it seems to us it follows necessarily that for a good consideration he may make a contract to waive such as the courts will enforce. . . . It was to remain entirely under his personal control, to be dealt with in such manner as he saw fit."[2] The result of this decision is, that our statute is nothing whatever like those of Wisconsin and Illinois, for any husband here, by giving notes with homestead waiver, can deprive his wife of her last dollar of homestead. The law permits him, without one syllable with her, to beggar her by his contracts; he may raise money on homestead waiving notes, wallow in drunkenness, reek in debauchery before her eyes. With the proceeds of his notes the creditor may drive her and her helpless children out—that voluntary creditor, who chose to trust him, knowing what misery would ensue. Yet it is pretended that while his wife is at the mercy of a brute's contracts, made with a voluntary creditor,—it may be against her tears and protests,—an involuntary victim of the husband's tort has no redress because of the wife's rights. If this be law, God help the victim. The logic of the law is the license of the libertine. I may be a seducer, a slanderer; I may beat, maim, and debauch with impunity; I may insult the law, and wrong my neighbor, and violate every domestic tie and oath with impunity, for, when called on to pay, I invoke the shield of the law and the sanctity of the hearthstone as good against my torts. Not for the benefit of the community, for that I despise. Not for the benefit of my wife, for her I have wronged; but for the benefit of myself. For after pleading her claim against my torts, I can take the last penny of it independent of her and my victims, by homestead waiving notes superior to both the claims, with the proceeds of which to pursue my debaucheries.

---

[2] Our own court of appeals has also sustained this view by a decision rendered since this argument was written, to wit. Read v. Union Bank, Va. Law J. Feb. 1878, p. 77; Whiteacre v. Rector, Id. p. 104.

It is argued that, because certain classes of claims are excepted from the operations of the homestead exemption, therefore all claims not specified, of whatsoever character, are barred. The answer to that is very simple. As the claims against which the homestead is declared good are all declared to be demands for "debts . . . contracted," so the exceptions specified are confined to the class of liabilities which sound in contract. Read the exceptions: (1) Purchase-money; (2) laborer's services; (3) fiduciaries; (4) taxes, etc.; (5) rent; (6) taxable fees. Every one sounding in contract. Is it possible that no tort was held by our lawgivers as entitled to the dignity of laborer's services or officer's fees? Is it possible that if I seduce the daughter of a clerk, in whose court I have a case, he can recover his clerk's fees out of my homestead, but not the damages done to his family or his honor? Is it possible that while the law protects my wife from the "imprudence" of my being a seducer, it does not protect her from my imprudence in running up an immense bill of officer's fees in fruitless litigation? Is it possible that if I seduce my servant girl, she can claim her wages out of my homestead, but not the damages for her loss of virtue? If this be law, then it is an outrage and a mockery. Yet the construction, based on the argument from these exceptions, leads to these absurd results.

The language of our court of appeals is quoted in which it is said that the law springs from reasons "benevolent, because the possession of the homestead is the security of the family against the improvidence, the follies, and the imprudences of the father or husband." The word "imprudences" is doubtless thought to apply to torts. Those familiar with the rugged Anglo-Saxon of our court of appeals well know that it does not use such term as "follies or imprudences" in referring to injuries, wrongs, or crimes. If that court were referring to seduction or to lewd insult, it would not characterize them as "follies or imprudences." Follies and imprudences in business may be very proper subjects for the homestead to operate upon, but to assume that the words "execution issued on any demand for any debt contracted," means, in effect, "execution on any demand for liabilities incurred," is not only to presume the convention ignorant of the statute they copied and its construction, and that it used different language in the two exemption laws without meaning differently, but is to import a sense different from the ordinary acceptation of the words used; to import words and statutes which are lacking, and which were confessedly essential to the construction given the Illinois and Wisconsin laws.

The concluding section of the law, which calls for a liberal construction, is invoked. Be it so. But liberality does not mean license. No liberality can justify the interpolation of words not used, or make an execution, issued "on a demand for a debt contracted" one issued "on a demand for a liability for a tort." As was said by Chief Justice Pearson, in his dissenting opinion in the case of Dellinger v. Tweed, 66 N. C. 214: "Such a construction not only makes the remedy greater than the mischief, but instead of providing a home and subsistence for unfortunate debtors, * * * grants impunity to wilful wrongdoers." It is not only an impunity to the wrongdoer, for in nine cases out of ten it takes away the civil remedy of the injured party entirely; but thereby destroys the civil remedy of the injured parties, and depriving them of any other mode of redress, provokes a breach of the peace. There is no public punishment provided for such wrongs. If the homestead right be upheld as against them, there is no private mode of redress, and violence and breach of the peace is invited. It is not like the case of contract. No one is obliged, unless he chooses, to trust any one hereafter so as to become his creditor by contract; but how can a man prevent slander or seduction if he has no mode of recovering damages? We have no public remedy for such; and, in the absence of such, I cannot believe the constitution intended to put every one at the mercy of the vicious and ill-disposed.

It is no answer to these overwhelming reasons to plead the vicarious sufferings of the wife and family. The public interest in the suppression of torts, and providing civil remedies to the outraged and oppressed, which will keep them from resorting to violence, overrides the humane feeling towards private individuals. The sufferings which they may entail on those around them often operate more powerfully to deter men from crime than any moral or social obligation, and it would be a strange state of law which allowed a husband to leave his wife penniless by his contracts, but gave no redress to a person who involuntarily became his creditor, by his wrong, and yet permitted the husband, while holding his injured victim off with one hand, to squander the property with the other, in spite of and in defiance of the claims of the law.

It is impossible to believe that the political reasons referred to as prompting the homestead apply to a case like this. Can it be conceived that any public policy dictates fostering a race of "tort feasors" in the community? Is the homestead intended to be the asylum of the violent? Is immunity from responsibility for violence calculated "to foster views of manly independence in the citizen?" Does the knowledge that a man may seduce, slander, beat, cheat, or do any tort he chooses, and be utterly irresponsible, unless he owns over $2,000. "tend to the settlement of a country by inviting immigration, and by holding out inducements to the improvement of property?" I rather think not. It is absolutely

ludicrous to read the reasons assigned for allowing the homestead, and compare them with the results arising from holding it good against torts. To adopt such a construction is to restore the old-time shot-gun policy to a state as the only hope of redress. The reasons for a homestead to unfortunate debtors are very good, but totally inapplicable as applied to tort feasors.

There can be no doubt that our lawmakers used the words "debts contracted" advisedly, and with full knowledge of their restricted meaning. All through the Code the distinction between debts contracted and torts is referred to, and wherever both are involved both referred to. Thus in section 2, c. 148, p. 1009, an attachment is allowed for the recovery of any claim "or damages for any wrong." Can it be believed that if our framers intended the homestead to cover "damages for any wrong" they would have failed to express it? Lord Mansfield was very fond of saying that the plea of infancy was given as a shield and not to be used as a sword. So of this homestead law. It was passed for the protection of the unfortunate, but not of the vicious.

I nearly omitted to refer to the decision upon the constitution of North Carolina, in Dellinger v. Tweed, 66 N. C. 214. That decision was rendered by three judges against two, and the two in the minority were Chief Justice Pearson and Rodman, J., the former by far the ablest member of the court. Judge Pearson's opinion is one of the most lucid and cogent I know upon this subject. But the language of the North Carolina statute is different from ours. Section 2: "Every homestead . . . not exceeding in value $1,000 . . . shall be exempt from sale under execution, or other final process obtained on any debt." I do not think the decision was right even upon this language. Still the language is not as strong as ours, for "debt contracted" is a smaller term than "debt."

The brief contained also paragraphs raising other objections to the exemption.

James Caskie, for bankrupt, in reply.

The counsel for the Mitchells in his note yields the point made in his answer in response to the bankrupt's petition, that the bankrupt is not, in fact, a citizen of this state, and therefore cannot claim the homestead exemption. He says: "It is conceded that whatever his intentions were, he did not, in point of fact, effectuate them so as to lose his citizenship. The evidence fails to show that he, in point of fact, did abandon his residence in Virginia, whatever were his intentions, or whatever they are now." This much being conceded, it only remains for us to discuss the question whether the homestead exemption can be claimed as against a judgment for a tort, and, if so, in what manner the homestead is to be held. We discussed these questions at length in our first note, and therefore will have but little to say in regard to them at this time. Before proceeding to answer the tort and usufruct propositions of the counsel for the Mitchells, we must notice some of the pleadings and evidence in this case as stated by him. The counsel quotes the evidence of the bankrupt and his wife to prove that their present intention is to leave the state. We deny that their evidence shows any such intention. But even if it does show such an intention, we insist that all evidence in this regard is not admissible, and that it is not in the province of the court to inquire into the present intention of the bankrupt in regard to leaving the state. In support of this proposition we refer to the following decision made in this state: "The court is further of the opinion that the circuit court did not err in excluding evidence of defendant's intention and declaration as to leaving the state since the date of the attachment. The fact in controversy is the existence at the time of suing out the attachment of an intention on the part of the defendant to leave the state. The existence of such an intention formed afterwards is not material, and not a sufficient ground for suing out an attachment. Declarations of the defendant made since the date of the attachment, as to his then existing intention to remove from the state, are not, in themselves, evidence tending to prove the existence of such an intention at the time of suing out the attachment." Wright v. Rambo, 21 Grat. 161.

In regard to the wife's evidence on this point (which we objected to at the time the question was asked), we refer to the following decision: "An examination of the bankrupt's wife will only be ordered when a prima facie case is made out by affidavit. It is not the intention of the statute to destroy the usual and proper confidence between husband and wife any more than between client and attorney. The cases in which the wife may be examined are where she is, on reasonable grounds, suspected of having, or having had property in her possession, which should have been surrendered to the assignee, or to have participated actively in other frauds upon the statute." In re Gilbert [Case No. 5,410].

The bankrupt denies that the trial of the cases of Mitchell v. Radway took place at the time they did, because their counsel yielded to the importunities of Radway, and his representations that he was detained in this state by the pendency of the causes. Not one word of evidence has been offered to support any such statement. The bankrupt claimed his homestead by deed duly recorded on 12th June, 1877, which was several days before any judgments were obtained against him. The attachments issued previous to this did not affect this homestead, as they were at best but conditional liens, and the filing of the petition of Radway, praying for adjudication as a bankrupt, dissolved the attachments, only about forty days having elapsed between the date of the suing out of the at-

tachments and the adjudication in bankruptcy. No judgment having been entered upon the attachments, it can, at best, be considered nothing but an attachment upon mesne process, which the adjudication in bankruptcy dissolved. It seems to us that it was the manifest intention of our statute to exempt to the householder property to the amount of $2,000 free from all debts, except such as were specially named in the statute. It is absurd to think that the words "debts contracted" are to be taken in their narrowest sense. The word "debt" was used to embrace every kind of obligation to pay money, and certainly a judgment on a tort is such an obligation. The word "contracted," used, as it is, with the words "heretofore or hereafter," obviously has reference to the time at which the obligation to pay the money was incurred. This construction is rendered sensible by striking out the words "heretofore or hereafter," since we must suppose that if these words relative to time had been omitted the word "contracted" would also have been omitted. The statute would then have read that the householder was entitled to $2,000, as against any debt, except such as it especially enumerates. Just here we again call attention to the amendment to the bankrupt law, March 3d, 1873, which, in our first note, we quoted in full. This act, according to our construction, gives the bankrupt $2,000 exemption, no matter whether the judgment was founded upon a debt ex contractu or ex delicto. We are unable to discover from the arguments of counsel any good grounds to sustain his proposition, that if the bankrupt is entitled to the homestead exemption, even then it is a mere usufruct, and that the court must require him to give bond and surety before he can get possession of it. If this is law, then the homestead exemption is a shadow; by it no benefits are conferred upon the householder, and the sooner it is erased from the statute-books the better. It is an exemption granted the householder, but clogged with such restrictions as in most cases to be entirely of no benefit to him. Such we cannot suppose to have been the intention of the constitution. Judge Waite, in the Case of Solomon [Case No. 13,166], gave the true interpretation to the meaning of the statute, in regard to the manner in which the householder should hold the exemption, when he said that the intention of the law was to give the householder full and absolute control over the exemption. Requiring him to give bond and surety, or investing the fund by direction of court, certainly takes from the householder this full and absolute control mentioned by Chief Justice Waite. It makes the statute inoperative, and such was not the intention of the legislature.

HUGHES, District Judge. The principal question in the case is whether under the Virginia law the homestead is good against judgments founded on torts. The courts of some of the states, proceeding upon the particular phraseology of the statutes of those states, have held that their homestead statutes did not embrace liabilities upon torts among those over which the exemption should prevail. But I do not think that the case at bar, depending upon the law of Virginia, can be affected by such rulings.

The language of our statute is, that the head of a family shall be entitled to hold, exempt from levy, etc., "on any demand for any debt heretofore or hereafter contracted," property not to exceed a certain value. The only question is whether the word "contracted" is used here in the narrow sense of an express contract formally entered into between two persons, by which at least one of them promises or undertakes something for a consideration, or whether it contemplates implied contracts, also; for the law raises implied contracts as well upon torts as upon express promises. The words preceding "contracted" in the phrase imply a latitudinous intention on the part of the legislature. This latitudinous intention would have been undeniable if the word "incurred" had been used in the place of "contracted." But as the word "incur" does not so strictly belong to the technical parlance of lawyers and legislators as the word "contract," and as the word "contracted" is a synonym of "incurred," I think we have a right to assume from the broad purport of the preceding words, "any demand on any debt," that the legislature intended its term "contracted" to be liberally interpreted.

The verb "to contract" has a variety of meanings, viz.: "to shrink; to shorten; to wrinkle, as the brow; to betroth; to acquire, as a habit, or a cold, or a disease; and to incur, as a risk, a debt, an obligation, a penalty, or a disability." Interpreted in this last sense, of "incur," it seems to run with the spirit of the words which precede it in the phrase in which it is used; while, by confining it to the narrow and strictly commercial meaning, we make it jar with the liberal tenor of those preceding words. What right, what warrant have we thus to do violence to what seems to be the natural meaning of the language of the legislature? Upon what reason, or rule of statutory construction, can we justify such a rigid, illiberal interpretation of a provision of law, most liberal in its purpose and tenor, as would strip it of half its effect and value? I think we are not only not bound to do so, but that we would not be justified in giving this law such a construction.

Going back to the word "debt," used in the phrase under discussion, why should we give it a narrow meaning when it appears that "any debt" is intended? A debt is, in law, an obligation to pay money, and the obligation may arise ex contractu or ex delicto. The obligation may be express, ex contractu; or implied, quasi ex contractu. It may arise ex delicto, upon actual tort; or quasi ex de-

licto, upon what the law chooses to treat as a tort. And thus it is plain that a debt or obligation may be contracted as well through a tort committed, as a bargain entered into.

Passing now from a philological treatment of the subject, let us consider it from a legal standpoint. The seventh section of article 11 of the Virginia constitution, previous sections of which provide a homestead exemption, is in these words: "The provisions of this article shall be construed liberally, to the end that all the intents thereof may be fully and perfectly carried out." By this direction, in our construction, all we have to do is to find what was the "intent thereof," and then if the provisions of the article can be so construed, even though they require a liberal interpretation, they must be "construed" in the sense which will effect the object of this constitutional provision, for so we are directed to do. No restricted sense is to be allowed to words if by so doing the object of the article is in any way defeated, but a broad meaning is to be put on the language used, always looking to the end for which the article was adopted.

Stress is laid by exceptants' counsel on the fact that a single member of the Virginia convention drafted (for all that we know without the knowledge of the great majority of the members) the homestead sections in similar terms to those of the New York law. We can't take cognizance of legislative proceedings, but are obliged to construe laws exclusively by their own terms. But even if we could construe them by extraneous circumstances, does the New York law contain a provision enjoining a "liberal construction?" I think not. No; our own statute must be construed by its own terms—all of its own terms. We have had the "intent" of our homestead provision plainly declared by our highest court. In Hatorff v. Wellford, 27 Grat. 360, 361, Judge Staples, speaking for the court, says the policy of homestead exemptions (this act being under discussion) is two-fold: one political, the other benevolent. Of the benevolent he says: "The possession of the homestead is the security of the family against the improvidence, the follies, the imprudences of the husband and father. 'Householder' or 'head of a family' are the terms pervading these homestead enactments—a home for the destitute and helpless, secure from financial ruin, and the pursuit of creditors. . . . . . No one can look through these various statutes without at once seeing that 'protection of the family' is one of the leading ideas upon which these exemptions are founded." And on page 363: "It has been held, in Georgia and North Carolina certainly, and probably in other states, that the object of the homestead laws is the security of the debtor and his family against the demands of the creditor."

It is admitted that C. L. Radway is a householder, or head of a family, and that he is now, and was when he claimed his homestead, a resident of Virginia. His right to a homestead, however, is contested on two grounds: 1st. That he intends hereafter to remove from the state. 2d. That the Mitchell claims against him arose from torts.

As to the first. The law does not expressly, nor by implication, require the householder to agree to live in Virginia all his life before he can obtain his homestead; and the requirement of this condition by a court would be to ingraft an entirely new provision upon the constitution, which would destroy entirely, in many instances, the object of the homestead article as it stands.

I cannot appreciate the argument that if his homestead is allowed to Radway and he thereafter leaves the state he will commit a fraud on his creditors. If there was anything in it the argument would apply to every person asking for his homestead.

As to the second ground, in order for it to be tenable the words of the article must be given the strictest and most technical meaning and the most illiberal construction. Such an illiberal construction would entail difficulties not anticipated. The words of the article are that the person shall "hold exempt from levy, seizure, garnishing, or sale, under any execution, order, or other process, issued on any demand for any debt heretofore or hereafter contracted." Strictly speaking no execution ever issues on any demand for a debt. It is only after the demand for the debt has become merged in a judgment that execution issues. Indeed a strict construction of the words would exclude judgments, which are not in themselves "debts contracted," though sometimes founded on debts contracted. Again, if the words "debts contracted" are to be taken in their narrowest meaning, as seems to be claimed, then they describe only debts which are expressly agreed to be paid by the debtor, and all other debts created by implication of law are excluded. And this is the ground on which it is contended that torts are not included in the words. This narrow construction would exclude from the operation of the homestead law many liabilities other than torts—in fact, all debts for which an express promise to pay cannot be produced. Such was not the intention of the law, else it has failed wofully in the effort to provide "a home for the destitute and helpless, secure from financial ruin and the pursuit of creditors."

Let us see what is a liberal construction of the words "debt contracted." Says Bouvier: "Debt is a sum of money due by certain and express agreement. In a less technical sense, as in the 'Act to regulate arbitrations and proceedings in courts of justice' of Pennsylvania, passed 21st March, 1806, § 5, it means any claim for money. In a still more enlarged sense, it denotes any kind of a just demand, 'as the debts of a

bankrupt.' One of the meanings given in our dictionaries to the word 'contract,' as a verb, is 'to incur.' So that a 'debt contracted,' in an enlarged or literal sense, means 'any kind of just demand incurred.'" We have seen that the words "execution issued on any demand for any debt contracted," mean execution issued on a judgment, as executions never issue on anything else. When we look to the legal effect of a judgment we find it is a "debt contracted." Says Blackstone (chapter 9, bk. 3, pp. 158, 159): "From these express contracts the transition is easy to those that are only implied by law, which are such as reason and justice dictate, and which therefore the law presumes that every man has contracted to perform, and upon this presumption makes him answerable to such persons as suffer by his non-performance. Of this nature are, first, such as are necessarily implied by the fundamental constitution of government, to which every man is a contracting party. And thus it is that every person is bound and hath virtually agreed to pay such particular sums of money as are charged on him by the sentence, or assessed by the interpretation of the law. . . . . Whatever, therefore, the law orders any one to pay, that becomes instantly a debt which he hath aforehand contracted to pay. . . . So that if one hath once obtained a judgment against another for a certain sum . . . . he may afterwards bring an action of debt upon this judgment, and shall not be put upon the proof of the original cause of action; but upon shewing the judgment once obtained still in full force and yet unsatisfied, the law implies that by the original contract of society the defendant hath contracted a debt and is bound to pay it."

From this it follows that every judgment, whatever may have been the nature of the action in which it was obtained, is a "debt contracted," and as the constitution looks to all claims as turned into judgments before they are affected by the homestead provision, which looks to exemption from process of execution upon judgments, all judgments are included in the words "debt contracted." This is made perfectly plain by looking to the exceptions to the operation of the homestead. If these exceptions had not been included in the words "debt contracted," in the first part and general provision of the article, there would have been no need to expressly mention them as cases to be excepted from the operation of those words. There are six exceptions, and three of them may, and two of them must, embrace claims put upon the debtor by implication of law, and not by express contract. Services rendered by a laboring man or mechanic, liabilities incurred by a public officer, and rent, may all be charged on a householder without any express contract on his part to pay.

A lawful claim for taxes, levies, or assessments, and the legal or taxable fees of any public officer or officers of a court, are put on the debtor by statute. and not by contract. If they were included, in the words "debt contracted," as undoubtedly they were, else they would not have been particularly excepted from the debts contracted liable to the claims of homestead, how can it be said that damages recovered in actions of tort, which are likewise put upon the debtor by law, without any express contract, are not embraced in the same words?[3] As another proof that the constitution uses the word "debts" in its largest sense, I refer to section 4 of this article 2: "The general assembly is hereby prohibited from passing any law staying the collection of debts, commonly known as stay laws." Should the assembly pass a law staying the collection of judgments on tort, that law might with some reason be held not to include a debt in the meaning of this homestead article.

Some stress has been laid in the argument at bar on the fact that one or more of the decisions which have held the homestead good against damages in actions of tort, stated, as one ground of the decision, that the homestead could not, in the particular case, by reason of statute, be alienated by the husband, except with the consent of his wife, and, ergo, he should not be permitted to incumber by his tort what he could not alone convey, and it is claimed that our statute is not similar in that respect. But so to hold is to overlook section 7, c. 183, p. 1171, of our Code, in which the joint deed of husband and wife is required to mortgage, incumber, or alien the homestead set apart in land. I would refer to Dellinger v. Tweed, 66 N. C. 206, to 17 Wis. 395, and to Conroy v. Sullivan, 44 Ill. 451, for decisions sustaining this view as to the validity of homestead over damages in cases of torts.

The argument that our homestead was the suggestion of a New Yorker, and therefore must be construed by New York decisions. is entitled to no weight, for the provisions are not identical. and the exceptions, adopted by the convention, themselves show that they understood the terms "debt contracted" in its broadest sense. Such arguments, however, are never more than persuasive, and to be used in default of other and better reasons. The right to the homestead does not depend on the question as to whether the attachments have ceased to be mesne process or not. If final judgment had been obtained, and execution were in the hands of the sheriff on the attachments, as well as on the claim, section 16, c. 183. p. 1173, Code 1873. provides a way to set apart the homestead, showing that no judgment can be a lien paramount to the claim of homestead.

Much has been eloquently said by the

---

[3] The use of the word "incurred" in the exceptions, shows that the words "debt contracted" and "debt incurred" are interchangeable terms in this article, and destroys effectually the narrow argument on the word "contracted."

learned counsel for the Mitchells on the nature of the torts on which they recovered. They cannot be justified or palliated, even if the females were in fault themselves; the cases and their aggravations have been passed upon before the jury, in their verdict, and the only question here is one purely legal, and we need, for its elucidation, no appeal to the feelings. Mrs. Radway and her child ask that the tort of the bankrupt shall not strip them of their homestead, which the law gives them secure "from the improvidence, the follies, and imprudences of the husband and father."

On the whole, I have no hesitation in overruling the exceptions to the register's report, and will make an order granting the bankrupt's petition.